IN THE UNITED STATES DISTRICT COURT
FOR DISTRICT OF PUERTO RICO

| | |
|---|---|
| David J. Pérez-Arritola<br><br>  Plaintiff<br><br>  V.<br><br>Carlos L. García-Muñiz; Carmen A. Solá-Morales and the García-Solá Community Property Partnership; MAC Development, Corp.; Individual Account for Carlos L. García-Muñiz at the Horizontes Development S.E. Retirement Plan Trust Fund; Miguel A. Ramos-Lozada; María M. Hernández-Sólivan; Ramos-Hernández Community Property Partnership; Plaza de Diego, S.E.; De Diego Village LLC; De Diego Village Holding Inc.; Puerto Rico Housing Financing Authority; U.S. Department of Housing and Urban Development; John Doe; Richard Doe; ABC Company; ABC Insurance Company.<br><br>  Defendants | CIVIL NO. _____<br><br><br>Jury Trial Demanded |

# **Complaint**

**To the Honorable Court**:

  **Comes now**, the plaintiff, engineer David J. Pérez-Arritola ("Mr. Pérez"), and through the undersigned attorneys, respectfully alleges, states, and prays:

## I.  Introduction

  1.     This is an action where Plaintiff seeks to adjudicate a disputed title to real property in which the United States [through the Department of Housing and Urban Development] claims an interest, other than a security interest or water rights.  Specifically, Mr. Pérez —in his personal capacity and as representative of the partnership called Plaza de Diego, S.E. ("PDD" or

471.0003

"Partnership")— seeks to recover title to the only property owned by the Partnership, after the other members executed a fraudulent scheme to transfer title to the Property to an entity of their own, so they could liquidate the Partnership before its term expired, get rid of Mr. Pérez as a partner, and keep to themselves the earnings generated by developing on the Property a rental residential complex under the Low Income Housing Tax Credit Program ("LIHTC Program") managed by U.S. Department of Housing and Urban Development ("HUD").

2.      Further, because in the execution of this scheme, several codefendants encumbered the Property with mortgages and restrictive covenants, which include some in favor of HUD, Mr. Pérez files this Quiet Title Action to clear and expunge from the Property Registry of Puerto Rico the cloud, restrictions, mortgages, and encumbrances currently affecting the Property.

## II.  Jurisdiction and Venue

3.      This Court has exclusive original jurisdiction by virtue of 28 U.S.C. § 1346(f) and the Quiet Title Act, 28 U.S.C. § 2409a ("QTA") since this is a civil action where Plaintiff seeks "to adjudicate a disputed title to real property in which the United States [through the Department of Housing and Urban Development] claims an interest, other than a security interest or water rights." *Id.*

4.      Mr. Pérez further invokes the supplemental jurisdiction of this Court under 28 U.S.C. §1367 to hear supplemental claims under the Laws and Constitution of the Commonwealth of Puerto Rico because they are also related to the federal claims, and they form part of the same case or controversy under Article III of the United States Constitution.

5.      As such, Mr. Pérez seeks relief from the defendants' actions in violation of Articles 1054 and 1077 of Puerto Rico's Civil Code of 1930, 31 P.R. Laws Ann. §§ 3018 and 3052.

6.      Venue in this Court is proper, and it has personal jurisdiction over Defendants

pursuant to 28 U.S.C. §1391(b) because the events and omissions giving rise to the Complaint occurred within the District of Puerto Rico.

7.    Plaintiff demands trial by jury.

### III.  The Parties

8.    Plaintiff, David Jesús Pérez-Arritola ("Mr. Pérez"), is of legal age, single, an engineer, a resident of the state of Florida, and a partner in Plaza de Diego, S.E.  His current physical address is 3089 Birkdale; Weston, FL 33332, and with residence in Puerto Rico at Salinas No. 11, Urb. Bonneville Heights, Caguas, PR 00725.  His telephone number is (787) 398-6000. Mr. Pérez appears on his behalf as a partner in Plaza de Diego, S.E., and in the representation of said Partnership.

9.    Codefendant, Plaza de Diego, S.E., is a Puerto Rico special partnership created by Deed No. 11, titled *Deed of Formation of Special Civil Partnership*, executed on December 21, 1993, before Notary Carlos Rodríguez-Cintrón.  PDD is the rightful owner of the real property whose title is in dispute as a result of the acts and omissions of several of the codefendants, which are fully described below.  Its physical address is Metropolis Commercial Building, Suite 112, 419 Juan Ponce De León Avenue, San Juan, PR 00917.  Its telephone number is (787) 758-6415.

10.    Codefendant, Carlos Luis García-Muñiz ("García") is of legal age; resident of Puerto Rico, married to Carmen A. Solá-Morales; a partner in PDD; sole shareholder and officer of MAC Development, Corp.; administrator and/or beneficiary of an Individual Account belonging to García at the Horizontes Development Retirement Plan Trust Fund; administrator and member with 90% of the membership interest in DDV MM, LLC, which is, in turn, is a member with .01% of the membership interest in De Diego Village LLC; president and shareholder with 90% of the shares of De Diego Village Holding, Inc.  His current physical address is Urb. Bucaré, # 3 Zafiro

Street, San Juan, PR 00969.  His telephone number is (787) 758-6415.

11.    The García-Solá Conjugal Partnership is composed of co-defendant García and his wife, Carmen A. Solá-Morales.

12.    Codefendant, MAC Development Corp. ("MAC"), is a Puerto Rico corporation created under the laws of the Government of Puerto Rico, with employer identification number 66-042-2467.  MAC is also the managing partner of PDD and an *alter ego* of co-defendant García. Its physical address is Metropolis Commercial Building, Suite 112, 419 Juan Ponce De León Avenue, San Juan, PR 00917.  Its telephone number is (787) 758-6415.

13.    Codefendant, Individual Account of Carlos L. García-Muñiz at the Horizontes Development S.E. Retirement Plan Trust Fund ("Target Retirement") is a Puerto Rico retirement plan trust fund created through Deed No. 190 of December 23, 1992, executed before Notary Eduardo R. Guzmán-Valiente.  Target Retirement is also a partner in PDD, an alter ego of García, and is included as a required party since, in its absence, the court cannot accord complete relief among existing parties; and/or it is so situated that disposing of the action in its absence may, as a practical matter, impair or impede its ability to protect its interest.  Its physical address is Metropolis Commercial Building, Suite 112, 419 Juan Ponce De León Avenue, San Juan, PR 00917.  Its telephone number is (787) 758-6415.

14.    Codefendant, Miguel Ángel Ramos-Lozada ("Ramos") is of legal age; resident of Puerto Rico, engineer; married to María Mercedes Hernández-Sólivan; partner in PDD, a member with 10% of the membership interest in DDV MM, LLC, which, in turn, is a member with .01% membership interest in De Diego Village LLC; and shareholder with 10% of the shares of De Diego Village Holding, Inc.  His current physical address is # 171 Street, kilometer 7.3, Rincón neighborhood, Cayey, PR 00736.  His telephone number is (787) 661-2260.

15.    The Ramos-Hernández Conjugal Partnership is composed of Ramos and his wife, María Mercedes Hernández-Sólivan.

16.    Codefendant, De Diego Village LLC ("DDV") is a Delaware limited liability corporation authorized to do business in Puerto Rico that was created by García and Ramos to take over and exploit, without Mr. Pérez's knowledge and participation, PDD's only real property and reason for its business.  Its physical address is Metropolis Commercial Building, Suite 112, 419 Juan Ponce De León Avenue, San Juan, PR 00917.  Its telephone number is (787) 758-6415.

17.    Codefendant, De Diego Village Holding Inc. ("DDVH"), is a corporation created under the laws of the Commonwealth of Puerto Rico.  DDVH is another of the entities created by García and Ramos to take over and exploit, without Mr. Pérez's knowledge and participation, PDD's only real property and reason for its business.  It is also a mortgage creditor for DDV.  Its physical address is Metropolis Commercial Building, Suite 112, 419 Juan Ponce De León Avenue, San Juan, PR 00917.  Its telephone number is (787) 758-6415.

18.    Codefendant, Puerto Rico Housing Finance Authority ("PRHFA") is a public corporation and a subsidiary of the Government Development Bank for Puerto Rico.  PRHFA is also DDV's mortgage creditor who is included as a required party since, in its absence, the court cannot accord complete relief among existing parties; and/or it is so situated that disposing of the action in its absence may, as a practical matter, impair or impede its ability to protect its interest.  Its physical and mailing address is 1903 Jesús T. Piñero Avenue; San Juan, PR 00920.   Its telephone number is (787) 946-0045.

19.    Codefendant United States Department of Housing and Urban Development is an agency of the United States of America that claims an interest in the real property whose title is in dispute, in the form of Restrictive Covenants duly recorded in its favor in the Property Registry of

Puerto Rico.  HUD also allocated and provided funds to the Government of Puerto Rico for the project developed by defendants DDV and DDVH on PDD's property whose title is in dispute. The address of its local office is Parque Las Americas I Building, 235 Federico Costa Street, Suite 200, San Juan, PR 00918.  The telephone number of its local office is (787) 766-5400.  The address of its headquarters is 451 7th Street S.W., Washington, DC 20410.  The telephone number of its headquarters is (202) 708-1455.

20.     Codefendant John Doe is a natural person whose identity is unknown at this time and who, together with the other codefendants, may be liable to Mr. Pérez for the facts alleged in this Complaint, or is a required party since, in its absence, the court cannot accord complete relief among existing parties; and/or it is so situated that disposing of the action in its absence may, as a practical matter, impair or impede its ability to protect its interest.

21.     Codefendant Richard Doe is a natural person whose identity is unknown at this time and who, together with the other codefendants, may be liable to Mr. Pérez for the facts alleged in this Complaint.

22.     Codefendant ABC Company is a legal entity whose identity is unknown at this time and who, together with the other codefendants, may be liable to Mr. Pérez for the facts alleged in this Complaint.

23.     Codefendant ABC Insurance Company is an insurance company whose identity is unknown at this time and who, together with the other codefendants, may be liable to Mr. Pérez for the facts alleged in this Complaint.

### IV.  The Facts

**A.   The Origins and Purpose of PDD.**

24.     In 1993, García, Ramos, Mr. Pérez, the entities MAC and Target Retirement, jointly

with Guillermo E. Llavona-Cartagena, agreed to form a Special Partnership.  Accordingly, on December 21, 1993, the partners executed Deed No. 11, titled *Deed of Formation of Special Civil Partnership*, before Notary Carlos Rodríguez-Cintrón ("Deed No. 11") and created the partnership named Plaza de Diego, S.E.

25.     In the execution of Deed No. 11, MAC and Target Retirement were represented by García, who identified himself as MAC's president, and Target Retirement's trustee and principal.

26.     PDD's purpose, as set by the partners in the FOURTH paragraph of Deed No. 11, is the following:

> The purpose of this Partnership shall be: to manage, operate, own and develop, build, rehabilitate, buy, sell and/or lease rehabilitate buildings, own and develop, buy, sell and/or houses, structures, and land; general construction projects at every stage; own, mortgage or lease any of those with their rights and privileges within the limits allowed by law; and agricultural activities of any kind and the administration thereof; and any other allowed by law directly or indirectly related or incidental to these purposes and activities.

27.     The partner's initial interests were as follows:
a)     García – 18.75%;
b)     Mr. Pérez – 22.05%;
c)     Ramos – 22.05%;
d)     MAC – 1%;
e)     Target Retirement – 31.25%; and
f)     Mr. Llavona – 4.9%.

28.     Over the years, Llavona retired, and later, García allegedly closed Target Retirement, although no evidence of such cancelation exists.  Their partnership interests, however, were left in abeyance since they were never reassigned as provided by Deed No. 11.

29.     The partners stipulated that PDD would be a fixed-term partnership with a 35-year duration; that is, until December 21, 2028.

30.     Likewise, the partners agreed that PDD would operate as a Special Partnership under Supplement "P" of Chapter 3 of Law No. 91-1954, as amended (known as the "Puerto Rico

Internal Revenue Code of 1994"), which would provide the Partnership and its partners a special

tax treatment and exclude the partner's assets from any third party's claim.

31.    MAC, the entity that held a 1% partnership interest in PDD and that appeared

represented by García, as its president, was designated as Managing Partner.

32.    García is MAC's sole shareholder.

33.    On December 22, 1993, after the Partnership was formed, PDD acquired property

number 34979 ("the Property") for $6,875,000 through Deed No. 114, titled *Deed of Purchase and*

*Sale*, executed before Notary Ernesto González-Piñero ("Deed No. 114").

34.    The Property is recorded on page 214 of volume 1,239 of the Property Registry,

Second (2nd) section of San Juan, with the following description:

> ---URBAN: Consisting of FOUR THOUSAND EIGHT HUNDRED NINETY-EIGHT POINT SEVEN HUNDRED TWENTY-EIGHT (4898.728) square meters, formed by a grouping of three urban plots within the Municipal boundaries of San Juan, Rio Piedras sector, not bordering with each other, formed in a single unit dependent on each other for the exploitation of a commercial development, with variable boundaries and access to Nuestra Señora del Pilar Street, Brumbaugh, and De Diego (Paseo de Diego).-------------------------------------------------------------------

35.    PDD appeared in Deed No. 114 represented by MAC, while García represented

MAC as its president.

36.    The Property was formed by grouping three non-contiguous independent lots,

located at (1) #61 Paseo de Diego Street, (2) #59 Nuestra Señora del Pilar Street, and (3) #65

Nuestra Señora del Pilar Street, all within the San Juan Municipality.  They are recorded with the

following description at the Property Registry:

> ---URBAN: Irregularly shaped plot, located within the municipal boundaries of San Juan, Rio Piedras sector, Puerto Rico, with a surface extension of FOUR THOUSAND SEVENTY-SEVEN POINT EIGHT HUNDRED THIRTY-EIGHT (4,077.838) square meters, abutting to the North with Enrique Hernández and Del Pilar Street, along EIGHTY-SIX POINT FIVE HUNDRED FIFTY-TWO (86.552) meters; to the South, with De Diego Street (Paseo de Diego), Luis G.  Hemaiz,

Antonio Gomez de Agüero, and José Martinez-Domic, along EIGHTY-EIGHT POINT SIX HUNDRED TWENTY-SIX (88.626) meters; to the West, with Enrique Hernández, Luis G. Hemaiz, and Brumbaugh Street, along SIXTY-TWO POINT EIGHT HUNDRED THIRTEEN (62.813) meters; and to the East, with Pilar Gomez and Luis Valle-Toledo, along SIXTY-NINE POINT FIVE HUNDRED SEVENTY-EIGHT 69.578) meters.----------------------------------------

---URBAN: Lot identified with the number three (3) located on Nuestra Señora del Pilar Street in the Town of Rio Piedras, measuring FIFTEEN (15.00) meters along the front, to the South, abutting with said Street; SIXTEEN POINT TWENTY-TWO (16.22) meters to the North, abutting with Heirs to Brigida Olivero and partially with Mrs. Concepcion Melina; THIRTY POINT EIGHTY-EIGHT (30.88) meters along the East side, abutting with lot number four (4) of the urbanizing blueprints, sold to Mr. Guillermo Morales-Suarez; and on the West side, along TWENTY-FIVE POINT FORTY-EIGHT (25.48) meters, abutting with lot number two (2) which was adjudicated to Mr. Antonio Gomez de Agüero and partially with the Burgos Heirs. It has a surface of FOUR HUNDRED FIFTY-FIVE POINT THIRTY (455.30) square meters. ----------------------------------------

---URBAN: Lot and house on Nuestra Señora del Pilar Street in Rio Piedras, with an irregular shape, measuring TWELVE (12.00) meters along the front on its South side, abutting with said street; on the right side facing East, it consists of three (3) lines, one is TWELVE POINT FORTY-SEVEN (12.47) meters and another one POINT SEVENTY (0.70) meters, both abutting with the principal property with this number, that is, the remaining portion; the other one, FOURTEEN POINT NINETY (14.90) meters abutting with the lot of Guillermo Morales-Suarez, measuring on the left side, West, TWENTY-SIX POINT NINETY (26.90) meters, abutting with lot No. Five (5) belonging to Antonio Sánchez; and to the North, along FOURTEEN POINT EIGHTY-TWO (14.82) meters abutting with Eudosia Colón and María Taforo. It has an extension of THREE HUNDRED SEVENTY-FIVE POINT FIFTY-NINE (365.59) square meters. It contains a single-story house in reinforced concrete, with a zinc roof, measuring SEVEN (7.00) meters wide and SIXTEEN (16.00) meters deep. -----------------------------------------------

37.    Part of the Property contained a shopping center and, according to the objectives and requirements of the Special Partnership, PDD began to operate the business under the name of "Plaza de Diego Mall".

38.    The shopping center's operation yielded profits during the first years. However, by approximately 1999, the partners needed to inject capital to meet the costs of operations.

39.    Mr. Pérez provided all the capital that was asked of him, or when he became aware of the need to contribute. He never refused to provide his portion of capital contributions.

40.    Between 2013 and 2017, Mr. Pérez, in addition to paying his share of the required capital, paid $314,488.31 on behalf of García, MAC, and Target Retirement. That contribution was used to pay some of the Partnership's mortgage loans, and García did not pay his share because he lacked the funds to do so.

**B.    García and Ramos's Scheme to Exclude Mr. Pérez.**

41.    In July 2015, codefendant García incorporated the entities DDV, DDVH, and DDV MM.

42.    García incorporated those entities to, exclusively with Ramos, purchase PDD's property and develop a rental residential complex under HUD's Low Income Housing Tax Credit Program and other incentives from state and/or federal programs ("the Project").

43.    Mr. Pérez was not informed of the incorporation of those entities or of García and Ramos' plan, nor was he invited to participate in the Project, despite the fact he was a partner in PDD and the Project would be developed on PDD's property.

44.    Although Mr. Pérez had heard that García was exploring the possibility of developing the Property through a subsidy program, neither García nor Ramos informed him that they planned to develop the Property outside of PDD and without his participation as a partner.

45.    Just as with other projects considered for the Property —such as the construction of mini-warehouses or a 130-apartment building— Mr. Pérez always thought all would be developed by PDD for the benefit of all the partners.

46.    Mr. Pérez never told García or Ramos that he was not interested in participating in future developments or projects. Quite the contrary, Mr. Pérez always wanted to participate in projects that would generate profits for the Partnership.

47.    So much so, that, on January 11, 2019, Mr. Pérez sent an email to Ramos to let him

know that he had not offered to sell his partnership interest in PDD to anyone, nor that he had received an offer to buy his interest.

48.     Contemporaneously with the creation of DDV, DDVH, and DDV MM, MAC — the manager of PDD, and whose sole shareholder is García— ceased to advertise or make efforts to attract visitors and tenants to the shopping center.

49.     After the creation of DDV, DDVH, and DDV MM in 2015, all efforts by MAC, García, and Ramos were directed at selling PDD's Property to DDV so that García and Ramos could acquire the Property at a lower value and profit from its exploitation without Mr. Pérez's participation.

## C.   García, Ramos, and MAC's Acts in Bad Faith and in Violation of their Fiduciary Duties.

50.     García, Ramos, and MAC never presented to PDD the opportunity to develop the Property through HUD's LIHTC Program.  All efforts to develop the Property through DDV and DDVH were conducted in secret, behind Mr. Pérez's back.

51.     Neither MAC nor any of the partners ever called a meeting to vote on whether or not the Property should be sold to DDV and developed outside of PDD.

52.     As part of the execution of this scheme to continue to exploit PDD's Property without Mr. Pérez's participation, on July 15, 2015, MAC signed a document as PDD's Manager titled Option to Purchase Agreement ("First Option"), in which PDD granted to DDV an 18-month option to purchase the Property in exchange for a $1,000 earnest money deposit.

53.     The purchase price set for the Property in this First Option was $3,100,000.

54.     García signed the First Option as MAC's representative, and MAC appeared as the representative of PDD.  Mairym Santana, an employee of García, signed on behalf of DDV.

55.     MAC never demanded payment of the $1,000 earnest money stipulated in the

option, and DDV, in turn, never paid it.

56.     Three months later, the Property value for MAC as well as for DDV changed drastically and inexplicably, because, on September 28, 2015, MAC executed a Second Amended and Restated Option to Purchase ("Second Option") and, in addition to extending the terms of the First Option by 18 months, reduced the purchase price to $500,000.

57.     The Second Option was signed by García as MAC's representative, and MAC appeared on behalf of PDD.  Mairym Santana, García's employee, signed on behalf of DDV.

58.     MAC never demanded payment of the $1,000 earnest money stipulated in the Second Option, and DDV, in turn, never paid it.

59.     The transaction did not take place, and on August 27, 2016, MAC executed a Third Amended and Restated Option to Purchase ("Third Option"), granting DDV another 18 months to purchase the Property for $500,000 in exchange for a $1,000 earnest money deposit.

60.     The Third Option was signed by García, exclusively, representing both MAC and DDV.

61.     Just like in the prior Options, MAC never demanded payment of the $1,000 earnest money stipulated in the Third Option, and DDV, in turn, never paid it.

62.     The Third Option expired, and the parties did not finalize the purchase and sale transaction.

63.     Even though the Third Option expired without DDV consummating the transaction, MAC —as PDD's Manager— never demanded the $1,000 agreed upon in the expired option.  Nor did it demand or retain for PDD the development documents and permits obtained by DDV at the time the Option had expired.

64.     On April 24, 2018, without having re-evaluated the Property's value, which, by this

time, had development blueprints, approvals, and financing, all of which increased its value, MAC executed a Fourth Amended and Restated Option to Purchase (Fourth Option), granting DDV another 18 months to purchase the Property for $500,000. All in exchange for another $1,000 in earnest money.

65.    This Fourth Option was signed by García as MAC's representative and Ramos as DDV's representative.

66.    Just like in the prior Options, MAC never demanded payment of the $1,000 earnest money stipulated in the Fourth Option, and DDV, in turn, never paid it.

67.    Before the Fourth Option expired, on August 29, 2019, MAC executed a Fifth Amended and Restated Option to Purchase (Fifth Option) and granted DDV an additional 18 months to purchase the Property in exchange for a $1,000 earnest money deposit. The purchase price in this Fifth Option was $650,000.

68.    This Fifth Option was signed by García on behalf of MAC and by Ramos on behalf of DDV.

69.    The $1,000 earnest money deposit for the Fifth Option was paid to PDD months after the agreement had been signed.

70.    In short, the first four options were simulated because the required considerations were never paid. Likewise, once the Third Option expired, MAC did not demand payment of the $1,000 due on the expired Option, nor did it demand the permits already obtained for the Property.

71.    The practice and custom in the commercial properties' sale and acquisition industry are to value options between 5 and 10% of the agreed-upon sales price.

72.    In this case, MAC and/or Mr. García valued the Options granted to DDV at no more than .16%.

73.    The reason why MAC —whose sole shareholder is García— valued the purchase option at .16%, is because the buyer (DDV) was an entity owned by García.  Thus, to benefit García and Ramos, MAC simulated four options and did not collect the money owed, in violation of its fiduciary duties and the Partnership's best interest.

74.    That the intent was to exclusively benefit García and Ramos is evident when considering that, years earlier, PDD executed other options with entities unrelated to García and Ramos, and in those instances, MAC demanded substantial deposits of earnest money.

75.    For example, in 2005, MAC granted an option to Canarias Developers, Corp., in exchange for an earnest money deposit of $100,000.

76.    Later, in 2007, when MAC granted Plaza de Diego Center, Inc., an option to purchase the Property, it demanded a deposit of $100,000 plus an additional $50,000 when the entity extended the term of the option.  Furthermore, when the option expired and the transaction did not go through, MAC retained the $150,000 that had been paid, something it did not do with DDV.

77.    Moreover, in the purchase option signed by Canarias Developers, Corp., the sales price agreed upon was $5,850,000.  In the option signed by Plaza de Diego Center, Inc., the sales price agreed upon was $3,000,000.

**D.    <u>The Culmination of García and Ramos's Plan to Exclude Mr. Pérez</u>.**

78.    On March 9, 2020, Mr. Pérez received a surprising email in which an employee of Mr. García invited all PDD partners to meet on March 16, 2020, to discuss PDD's debt with the Municipal Revenue Collection Center ("MRCC"), the sale of the Property, and PDD's liquidation, among other matters.

79.    The meeting was canceled by García on the same March 16.

80.     Then, on May 13, 2020, Mr. Pérez received another email that included a 359-page document in PDF format.

81.     The first page of the PDF document was a letter signed by García, as MAC's representative, addressed to Mr. Pérez and Ramos, and, in part, the letter stated:

> I am also including the calculations for the partnership's liquidation, having sold the only asset the partnership owned.  As you will see, the Partnership's liquidation reflects a loss, since the value of the property was much lower than the debts.

82.     Before May 13, 2020, neither García, Ramos nor MAC's personnel, informed Mr. Pérez that the entity DDV, whose members at that time were García and Ramos, engaged in any efforts to buy PDD's Property and signed the five options described in the preceding paragraphs. Much less, that García and Ramos had been planning for five years to sell the Property to themselves, liquidate the Partnership, and exclude Mr. Pérez from the riches of the Project on PDD's property.

83.     Had García, Ramos, or MAC's personnel informed Mr. Pérez of their plans with the Property, he would have contributed financially and participated in the development, as he always did with the other projects of the Partnership.

84.     Mr. Pérez also learned, from the documents sent, that an agreement had been reached in August 2019 to pay off the MRCC debt, that the debt was paid off, and that no one asked him to contribute to the payment of that obligation.  Had Mr. Pérez been told the debt was going to be paid off, he would have paid his share.

85.     Surprised by the conduct of the other partners, Mr. Pérez began to inquire and discovered that García and Ramos had created DDV without informing him and that they had already submitted a proposal under the LIHTC Program to build a 94-apartment building on the Property.

86.   Based on information and belief, the LIHTC Program provides funds for the development of apartments to be rented to low-income individuals, and, after several years, allows the developer to sell the apartments and reap the profits of the sale.

87.   Based on information and belief, a Valuation Report was included with the proposal to HUD.  Said Valuation Report includes, amongst others, an estimate of $4,500,000 in short-term profits for the developer.

88.   The Report, however, does not contemplate the developer's long-term profits that will be derived from renting the apartments and/or selling them in the future, which is estimated to be between $15,000,000 to $20,000,000.

89.   In short, Mr. Pérez discovered that MAC, García, and Ramos devised and executed a plan to continue to engage in a business in line with the purposes of PDD: "own and develop, build, rehabilitate...lands", with PDD's property, but through a different entity owned exclusively by García and Ramos, so that, by selling PDD's sole asset, García and Ramos could liquidate the Partnership before its term, get rid of Mr. Pérez as a partner, and keep to themselves the $4,500,000 short-term profits, and the $15,000,000 to $20,000,000 that the development could produce in the long-term.  This was done through an act disguised as an ordinary act of administration.

90.   Disagreeing with the liquidation and, primarily, with the sale of PDD's sole asset, Mr. Pérez sent an email on May 27, 2020, to García, objecting to the sale of the Property and the liquidation of the Partnership.

91.   Unbeknownst to Mr. Pérez, MAC Development had already sold the Property. Nevertheless, García replied and proposed a telephone conference for June 4, 2020, at 3:00 p.m., to discuss the objections to the sale and liquidation of the Partnership.

92.   Not knowing that the Property had been sold and intending to raise some of the

matters discussed during the telephone conference scheduled for June 4, Mr. Pérez sent an email to García and Ramos on June 2, 2020, asking them for information about PDD and DDV.

93.     The telephone conference took place as scheduled.  During the call, Mr. Pérez stated that he saw only two options to solve the problem: first, that he be allowed to participate in the Project, or, second, for him to receive compensation from the revenue generated by DDV in an amount equal to his share in the Partnership.  He also stated that it was his perception that he was being pushed out of the Partnership so García and Ramos could keep the profits of the Project to themselves.

94.     García categorically refused to allow Mr. Pérez to participate in the development.

95.     Later, Mr. Pérez received an email from one of García's employees with a document titled *Deed of Purchase and Sale*.  When he opened it, he learned that the Property had already been sold on May 15, 2020, two days after the communication of May 13, 2020, and 19 days before the June 4 meeting that García represented would take place to discuss Mr. Pérez's objections to the sale and the liquidation of the Partnership.

96.     The sale of the Property was executed through Deed No. 1, titled *Deed of Purchase and Sale*, before Notary Mayra García-Solá –García's daughter– and for the purchase price of $620,000 ("Deed No. 1").

97.     PDD, as the seller, was represented by MAC, and MAC was represented by Ramos. DDV, as the buyer, was represented by García.

**E.   The Creation of the Encumbrances in the Interests of the United States that Cloud the Title of the Property.**

98.     DDV and DDVH also executed on May 15 other obligations and deeds that allowed them to develop the Property under the LIHTC program.

99.     PRHFA provided a $10,300,000 loan to DDV under the terms and conditions of the

*Construction Loan and Security Agreement* ("Construction Loan"), and, in turn, executed a *Mortgage Note* and Deed No. 2, titled *Deed of Mortgage*, before Notary Armando Martínez-Fernández ("Deed No. 2").

100. Then, DDVH and PRHFA executed the *Community Development Block Grant - Disaster Recovery (CDBG-DR) Grant Agreement for CDBG-DR GAP to Low-Income Housing Tax Credit Program* ("GAP Financing Agreement"). Under the GAP Financing Agreement, DDVH obtained from HUD –through PRHFA, an $18,127,253 grant.

101. Afterward, DDVH provided the grant money to DDV as a soft loan for the construction of the Project under the LIHTC program. In consideration, DDV executed a *Pledge Agreement and Assignment*, *Mortgage Note*, and Deed No. 4, titled *Deed of Mortgage*, before Notary Armando Martínez-Fernández ("Deed No. 4"). The *Deed of Mortgage* encumbers the Property ("CDBG-DR Deed of Mortgage").

102. Under the Construction Loan, DDV must comply at all times with the provisions and requirements of the CDBG-DR program. Additionally, any default by DDV of its obligations under the CDBG-DR program can be considered a default under the Construction Loan.

103. Additionally, in compliance with the requirements of the CDBG-DR program, DDV executed Deed No. 1, titled *Declaration of Land Use Restrictive Covenants for Low Income Housing Credits*, before Notary Armando Martínez Fernández.

104. Finally, in compliance with the requirements of the CDBG-DR program, DDV executed Deed No. 3, titled *Constitution of Land Use Restrictive Covenants Community Development Block Grant Disaster Recovery Program (CDBG-DR) De Diego Village*, before Notary Armando Martínez Fernández ("Deed No. 3" or "Restrictive Covenants").

105. The Restrictive Covenants are recorded in the Property Registry of Puerto Rico in

favor of PRHFA and HUD.

106.    The purpose of the Restrictive Covenants is to ensure compliance by whoever owns the Property with the Continuing Appropriations Act of 2018, the Supplemental Appropriations for Disaster Relief Requirements Act of 2017, the Notices by the Office of the Assistant Secretary for Community Planning and Development (83 Fed. Reg. 5844 (Feb. 9, 2018) and 83 Fed. Reg. 40314 (Aug. 14, 2018)), and limit the use of the Property to those allowed under the CDBG-DR and LIHTC programs.

107.    As such, they have a preferential rank over the *CDBG-DR Deed of Mortgage* and the *Deed of Mortgage* executed by PRHFA to secure the Construction Loan.

108.    The Restrictive Covenants prohibit anyone from using the Property for purposes other than those for which the funds of the CDBG-DR program were granted.  They require DDV, as the current title holder of the Property, and all subsequent owners of the Property, to use and maintain the Property in accordance with the provisions of the CDBG-DR grant and applicable regulations.  Specifically, it requires that the Property be developed under the LIHTC Program, it limits the use of the property for residential purposes, limits the potential renters, and mandates a rent cap.

109.    Furthermore, the Restrictive Covenants significantly limit the property rights and liberties of the owner of the property in question by imposing limits on the purposes for which the Property may be used.

110.    As such, they constitute an interest in real property (*derecho real*) in favor of PRHFA and HUD.

111.    In sum, while the Restrictive Covenants exist, the Property may not be used for any other purpose as outlined in the Restrictions or in violation of the CDBG-DR and LIHTC

programs.

**F.    The Consummation of García and Ramos's Plan**

112.    On June 15, 2020, Mr. Pérez sent another email to García, to reiterate his request for information about PDD's and DDV's operations.

113.    García produced part of the information requested but not the most critical, the one that would allow Mr. Pérez to properly assess PDD's value, the move to sell the Partnership's sole asset, and his exclusion from participating in a business that should have belonged to PDD.

114.    On June 18, 2020, García sent a letter to Mr. Pérez dated June 17 of that same year, in which he stated he had already provided all the requested information.

115.    DDV and DDVH are the entities García and Ramos created outside of PDD to be able to develop the Project with PDD's Property and without Mr. Pérez's participation as a partner.

116.    At the time of the sale of the Property, García and Ramos were the only members of DDV.

117.    Today, they are the only members of DDVH.

118.    Thus, DDV and DDVH are part of and knowledgeable participants in the scheme designed by García and Ramos that allowed them to continue to conduct a business in line with PDD's purposes, with its Property, but without Mr. Pérez's participation.

119.    DDV and DDVH are, in fact, a front and alter ego of García and Ramos, created to allow them to continue to conduct a business in line with PDD's purposes, with its Property, but without Mr. Pérez's participation.

120.    Evidence that DDV and DDVH are alter egos of García and Ramos surfaced recently when Mr. Pérez discovered that García or MAC were using PDD's proceeds from the sale of the Property to pay the fees of the attorneys that represent DDV and DDVH.  Similarly, PPD's

funds were used to cover MAC's legal expenses.

### Derivative Action in Representation of Plaza de Diego, S.E.

121.    Every one of the preceding paragraphs is adopted by reference and made a part of this paragraph.

122.    Mr. Pérez appears in his capacity as partner and on behalf of PDD.

123.    Mr. Pérez has always been and currently is a partner in PDD.

124.    Mr. Pérez has a genuine interest in safeguarding PDD's best interests and has the ability and resources to move forward firmly on the causes presented herein.

125.    Mr. Pérez did not cause nor participate in the acts that prejudiced PDD as alleged in this Complaint.

126.    García, Ramos, and MAC acted in bad faith, unlawfully, and in violation of their fiduciary duties towards PDD by creating a parallel entity to keep to themselves the benefits that should have been common to all, and to untimely liquidate the Partnership.  Specifically, they devised and executed a plan to continue to engage in a business in line with the purposes of PDD: "own and develop, build, rehabilitate...lands", with PDD's property, but through a different entity owned exclusively by them, so that by selling PDD's sole asset, García, and Ramos could liquidate the Partnership before its term, get rid of Mr. Pérez as a partner, and exclude him from participating in the $4,500,000 short-term profits, and the $15,000,000 to $20,000,000 that the development could produce in the long-term.  This was done through an act disguised as an ordinary act of administration of the Partnership.

127.    García, Ramos, and MAC acted in bad faith, unlawfully, and in violation of their fiduciary duties towards PDD by selling the Partnership's only asset to liquidate PDD, get rid of Mr. Pérez as a partner, and keep to themselves the benefit that should have been common to all.

This was disguised as an ordinary administrative act, but with the intent of causing injury to the rights of Mr. Pérez as a partner in PDD. Also, without the unanimous consent of the partners because not all agreed with the process of liquidation.

128.    Additionally, by selling the Partnership's sole asset, MAC —as alter ego of García, canceled PDD's option to operate as a Special Partnership— thereby eliminating the special tax treatment and protection afforded to the partner's assets before third parties, because it ceased to conduct the business required by Supplement "P" of Chapter 3 of Law No. 91-1954, as amended, such as the business activity to develop land and/or to lease buildings.

129.    MAC, moreover, and as alter ego of García, acted in bad faith by granting purchase options for five years in a row to an entity belonging to García, and at a cost contrary to prior agreements and PDD's best interests. Specifically, by failing to demand a down payment as is the standard in the industry, by failing to collect on the agreed-upon payment, and by failing to retain it when the Option term ended and García's entity did not buy the Property.

130.    Likewise, MAC acted in bad faith, unlawfully, and without the required consent when it sold the Partnership's only asset to an entity belonging to García and Ramos, so both could continue to conduct business in line with PDD's purposes: "own and develop, build, rehabilitate ...land", with PDD's property, but without Mr. Pérez's participation.

131.    Mr. Pérez opposed the sale of the Property as well as the liquidation. He also asked for information regarding the valuation of the Property, its management over the course of the last years, and everything related to DDV's new project. His opposition and requests were ignored. In the end, García did not produce the vital information requested, and, together with the other partners, proceeded to sell the Property on May 15, 2020, and started liquidation proceedings.

132.    In essence, Mr. Pérez asked that the actions of the officers be corrected, but the

other partners refused to do so.

133.    Those who have control and administration of PDD have no interest whatsoever in presenting these claims since it would harm their interest outside of PDD.  Therefore, Mr. Pérez is forced to file this Complaint as a representative of PDD to preserve the Partnership's rights and look out for its interests as a partner.

## V.  Causes of Action

### First Cause of Action
### Quiet Title-Revindication of the Property

134.    Every one of the preceding paragraphs is adopted by reference and made a part of this paragraph.

135.    MAC —as the Partnership's administrator— was vested with the authorization to sell goods and properties belonging to the Partnership, but only as long as the sale was in good faith, consistent with the purpose of the Partnership and to the best interest of its partners, that is, in compliance with MAC's fiduciary duties.

136.    MAC did not sell the Property to benefit PDD and its partners.  Quite the contrary, MAC sold the Property to benefit only García and Ramos, to the detriment of Mr. Pérez's rights as a partner.

137.    Specifically, MAC —which is controlled exclusively by García— sold the Property so that García and Ramos could continue to engage in a business in line with PDD's purposes: "own and develop, build, rehabilitate...lands", with PDD's property, but without the participation of Mr. Pérez.

138.    The cause behind the sale was to exclude Mr. Pérez from participating in the profitable development of PDD's property, a right he had as a partner of PDD.  In other words, to harm him, as the third party he was to the transaction.

139.    So, when MAC sold the Property and DDV purchased it, they, in fact, executed a contract to harm a third party, Mr. Pérez.

140.    And, because at the time the only members of DDV were García and Ramos, DDV knew the sale was executed to harm the interests of Mr. Pérez as a partner in PDD.

141.    Thus, the cause of the sale of the Property is unlawful, considering that the end of the scheme was to allow García and Ramos to reap the benefits of the development of a new project, with PDD's property, but without the participation of one of PDD's partners.

142.    Since the cause of the transaction is unlawful, and both parties knew of the unlawful cause, the transaction is null and void.

143.    The Partnership's liquidation or attempted liquidation by selling its sole asset is also unlawful.

144.    First, since MAC, García, and Ramos intended to liquidate the Partnership with the sale of the Property and Mr. Pérez voiced an objection, a unanimous vote of all the partners was required to execute Deed No. 1 and sell the Property.

145.    Here, not all the partners agreed with the sale of the Property or its inexorable liquidation.

146.    Second, the sale of the Property and liquidation of the Partnership cannot be deemed to have been ratified by a majority of the partners just because MAC, García, and Ramos appeared on Deed No. 1.  Their partnership interests did not exceed 42% because Mr. Llavona and Target Retirement's partnership interest were never transferred in accordance with Deed No. 11.

147.    Consequently, MAC acted without authorization and could not, therefore, consent to the sale of the Property and its inescapable liquidation of the Partnership.

148.    Lacking the element of consent, the transaction is null and void.

149.    Furthermore, the sale of the property was an act of bad faith on the part of MAC, considering that the reason behind the transaction was to kick out a partner, liquidate the Partnership, and pave the way for García and Ramos to continue with PDD's business with a new project and without Mr. Pérez as a partner.  Wherefore, Mr. Pérez, in a derivative capacity, files this quiet title action to recover title to the Property by seeking a declaration that Deed No. 1 is null and void.

150.    Under Art. 1247 of Puerto Rico's Civil Code of 1930, 31 P.R. Laws Ann. §§ 3496, the nullification of Deed No. 1 requires the restitution of the Property to PDD.

151.    Thus, Mr. Pérez asks this Court to declare Deed No. 1 null and void and that title to the Property be returned to PDD.

152.    In addition, since several mortgages and restrictive covenants currently encumber the Property and cloud its title, Mr. Pérez, in a derivative capacity, files this quiet title action to eliminate any cloud, restriction, and right that currently encumbered the Property, and that resulted from the null acts of MAC, García, Ramos, DDV and DDVH, including those in favor of HUD.

153.    Under the QTA a plaintiff may file a civil action to adjudicate a disputed title and remove a cloud from the tile of real property in which the United States or its agencies claims an interest.  See 28 U.S.C. § 2409a.

154.    HUD has a real interest (*derecho real*) in the Property, consisting of Restrictive Covenants duly recorded in the Property Registry of Puerto Rico.

155.    Thus, Mr. Pérez asks that this Court declare null and void the Restrictive Covenants in favor of HUD that currently encumbers the Property.

156.    Mr. Pérez also asks that this Court declare null and void the mortgage in favor of DDVH that currently encumbers the Property.

157.    Equally, Mr. Pérez asks that this Court declare null and void the mortgages and Restrictive Covenants in favor of PRHFA that currently encumber the Property.

158.    Moreover, Mr. Pérez asks that this Court Order the Registrar of the Puerto Rico Property Registry ("Registrar") to register the Property under PDD's name and expunge from the Registry all mortgages, liens, encumbrances, and restrictions that currently encumber the Property, including all those in favor of DDVH, PRHFA, and HUD.

**Second Cause of Action**
**Stay of the Special Partnership's Liquidation Process**

159.    Every one of the preceding paragraphs is adopted by reference and made a part of this paragraph.

160.    The sale of the Property by MAC constituted an act of liquidation because, among other things, MAC sold PDD's only asset, took away its reason for being, and caused PDD to lose the option to operate as a Special Partnership under Supplement "P" of Chapter 3 of Law No. 91-1954, as amended.

161.    García himself understood it that way, when, on May 13, 2020, he sent a communication to the partners with a breakdown of their respective partnership interest in the remnant of the Partnership, and told them that the sale of the Property amounted to the liquidation of the Partnership: "I am also including the calculation for the partnership's liquidation, having sold the partnership's sole asset".

162.    Deed No. 11 requires that a majority of the partners vote for the dissolution of the Partnership to commence the process.

163.    MAC did not conduct a vote of the partners to determine if a majority would favor liquidation.  Additionally, since the partnership interests of Mr. Llavona and Target Retirement were left in abeyance since they were never transferred to the remaining partners in accordance

with Deed No. 11, García, Ramos, and MAC lacked the majority needed to liquidate the Partnership. Therefore, MAC lacked any authority to initiate a liquidation process.

164.    Furthermore, MAC sold PDD's only asset to liquidate the Partnership and to ensure that only two partners, García and Ramos, would reap the benefits of the new development on the Property. As such, MAC sold the Property and liquidated the Partnership while acting in bad faith.

165.    The mere fact that García was able to use the Property to develop a housing project with projected profits of no less than $4,500,000 and a possible long-term profit between $15,000 and $20,000,000 clearly shows that the PDD's business still had the potential to generate riches for its partners. So, the sale of the Property and the liquidation of the Partnership were unreasonable and unwarranted. The only purpose was to benefit García and Ramos, to the exclusion of Mr. Pérez. That being the case, the dissolution promoted by García, Ramos, and MAC is *ultra vires* and, as such, requires its immediate stay.

## Third Cause of Action
## Damages Caused by the Breach of Administrative and Fiduciary Duties

166.    Every one of the preceding paragraphs is adopted by reference and made a part of this paragraph.

167.    The SEVENTH paragraph, item one on pages 189 and 190 of Deed No. 11 grants ample administrative powers to the managing partner. Those powers, however, are to be exercised to promote PDD's interests, directly or indirectly.

168.    The SEVENTH paragraph, item one on page 193 of Deed No. 11, establishes in part that "[e]very Partner answers to the Partnership for the damages it may have suffered on their account...".

169.    The SIXTEENTH paragraph, the fourth item on page 199 of Deed No. 11, establishes that the managing/liquidating partner "shall be liable to the Partners for any harm that

the common fund suffers due to fraud or severe negligence in the performance of its duty."

170.    MAC, García, and Ramos devised and executed a plan to continue to engage in a business in line with the purposes of PDD: "own and develop, build, rehabilitate...lands", with PDD's property, but through a different entity owned exclusively by them, so that by selling PDD's sole asset, García and Ramos could liquidate the Partnership before its term, get rid of Mr. Pérez as a partner, and exclude him from participating in the $4,500,000 short-term profits, and the $15,000,000 to $20,000,000 that the Project could generate in the long-term.  MAC, García, and Ramos granted five Options while failing to comply not only with the industry's practice for such contracts but also with PDD's historical conduct.  These contracts contained leonine clauses that, far from benefiting PDD, prejudiced it, not to mention that they were created for the exclusive benefit of DDV and its two members, García and Ramos.  Additionally, the contracts did not require a reasonable down payment, causing the partnership a loss of income estimated at approximately $750,000.

171.    The purpose of executing five Options was to take the Property off the market to make sure that only García and Ramos's alter ego entity, DDV, could purchase it after the Property had lost sufficient value.  That is, to ensure that García and Ramos could generate greater profits for the new company.

172.    MAC and García failed to comply with their fiduciary duties and caused PDD damages by not making advertising efforts to attract visitors and tenant stores, intending to devalue the property so they could acquire it at a reduced price, thereby prompting a loss in income valued at over $300,000.

173.    MAC, García, and Ramos failed to comply with their fiduciary duties and caused PDD damages by using PDD's funds for their personal use and gain including paying the fees of

the attorneys that represent DDV, DDVH, and MAC.

**Fourth Cause of Action**
**Exclusion of Partner from the Partnership**

174.    Every one of the preceding paragraphs is adopted by reference and made a part of this paragraph.

175.    The SEVENTH paragraph, item one on page 191 of Deed No. 11 establishes that any managing partner that misuses his or her powers to cause material prejudice to the Partnership or acts in bad faith may be replaced.

176.    MAC Development, García, and The Retirement Plan, as alleged, acted in bad faith and in violation of their fiduciary duties towards PDD and its partners.

177.    Such unlawful acts to the detriment of PDD's best interests warrant that García, MAC, Target Retirement (entities under García's control), and Ramos be excluded as PDD's partners.

**Fifth Cause of Action in the Alternative**
**Damages**

178.    Every one of the preceding paragraphs is adopted by reference and made a part of this paragraph.

179.    Should the Property's Sale to DDV not be annulled, Mr. Pérez and PDD, in a derivative action, seek in the alternative that all income generated from the project developed on the Property by DDV, DDVH, García, and Ramos be assigned to PDD.

180.    DDV is the entity García, and Ramos created to buy PDD's property and defraud Mr. Pérez.  It is in reality an alter ego of both García and Ramos to hide their identities so they can continue to exploit the Property and enrich themselves without Mr. Pérez's participation.  So, because García and Ramos formed and used DDV to execute this scheme, their acts and intentions

are considered to be DDV's as well.

181.    DDV bought the property while knowing that the sale was intended to defraud Mr. Pérez by excluding him from reaping the benefits of the new project with the property of PDD.

182.    DDV is not a passive or innocent entity because it was a knowledgeable and willing participant in the design and execution of the scheme concocted to defraud Mr. Pérez.

183.    Therefore, DDV is a participant in the scheme to defraud Mr. Pérez as a partner and therefore responds for any damage caused.

184.    DDVH is the other entity García, and Ramos created to control the development and receive the earnings from the new development.  It is in essence an alter ego of both García and Ramos created to hide their identities so they could continue to exploit the Property and enrich themselves without Mr. Pérez's participation.  So, because García and Ramos formed and used DDVH to execute this scheme, their actions and intentions are attributed to DDVH.

185.    DDVH has continued to develop the Project with the Property while knowing that all was a scheme to defraud and cause harm to Mr. Pérez.

186.    DDVH is not a passive or innocent entity because it was a knowledgeable and willing participant in the design and execution of the scheme concocted to defraud Mr. Pérez.

187.    Therefore, both DDV and DDVH respond for the damages and losses suffered by PDD, consisting of its liquidation before the expiration of its term and the elimination of its sole asset which would generate, with the project, between $15,000,000 to $20,000,000.

188.    That being the case, the monies generated by both entities belong to or should be assigned to PDD.

## **Piercing the Corporate Veil**

189.    Every one of the preceding paragraphs is adopted by reference and made to form

part of this paragraph.

190.    MAC is the alter ego or passive economic conduit of García.

191.    García never separated his capital from MAC's.  For example, García always voted on PDD matters on behalf of MAC.  Sometimes, MAC's vote was not counted, nor was there an independent person who acted only on behalf of MAC.  Likewise, MAC never made the economic contributions to the Partnership that it should have.  All payments were made by García out of his capital to the extent, of course, his economic capacity allowed him.  Once García lost the capacity to capitalize PDD, MAC also lost its economic capacity.  From that point forward, all contributions that should have been made by García and MAC, separately, were made by Mr. Pérez and Ramos, both on behalf of García and MAC.

192.    Moreover, in this scheme to remove Mr. Pérez as a partner, liquidate the Partnership, and continue to exploit the Property through a different entity, MAC acted solely and exclusively to further García's interest, who, together with Ramos, would be the only beneficiaries of the Property's sale to DDV and the development of the new project.

193.    For example, for five consecutive years, MAC granted five Options to Purchase Agreements to DDV —an entity belonging to García and Ramos— at a cost well below, not only what the market would expect, but what MAC had demanded when it granted other Options to third parties.

194.    Similarly, when one of those options granted by DDV expired without the sale taking place, MAC did not retain the down payment agreed upon as it did in other instances in which the option holder was not García or one of the entities created and controlled by García.

195.    In short, García used MAC as an alter ego or passive business conduit to have greater control over PDD and, later, to execute a plan intended to remove Mr. Pérez from the

Partnership, cancel it before its term, and be able to continue to exploit PDD's property without Mr. Pérez's participation.  All of this is disguised as an ordinary act of administration and to the detriment of Mr. Pérez's rights as a partner.

196.    Therefore, it is appropriate to pierce MAC's corporate veil, so García may respond in his personal capacity for the damages caused by the former.

**Wherefore**, Mr. Pérez, as a partner and in a derivative action as PDD's representative, respectfully requests that this Court rule in his favor and grant the following remedies:

A.    Declare Deed No. 1 null and void, and order the return of the considerations.

B.    Declare PDD as the rightful owner of the Property.

C.    Declare null and void all mortgages, liens, encumbrances, and restrictions that currently encumber the Property, including all those in favor of DDVH, PRHFA, and HUD.

D.    Order the Registrar to register the Property under PDD's name and expunge from the Registry all mortgages, liens, encumbrances, and restrictions that currently encumber the Property, including all those in favor of DDVH, PRHFA, and HUD.

E.    Stay PDD's attempted liquidation.

F.    Pierce the corporate veil of MAC and condemn García and Ramos, jointly, to pay $20,000,000 as compensation for the damage caused to PDD for violating their fiduciary duties towards the Partnership.

G.    Exclude García, MAC, Target Retirement, and Ramos from participating in PDD.

H.    In the Alternative, condemned DDV and DDVH to assign their profits to PDD. And,

I.    Condemn all parties to pay court costs and legal fees, as well as provide any other remedy appropriate under the law.

**Respectfully Submitted**.

In San Juan, Puerto Rico, on April 27, 2023.

**I Hereby Certify** That on this same date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all attorneys of record.

s/ *Adrián Sánchez-Pagán*
Adrián Sánchez-Pagán
USDC No. 223311
asanchez@sbsmnlaw.com

s/ *Luis M.  Ferrer-Medina*
Luis M.  Ferrer Medina
USDC No. 224211
lferrer@sbsmnlaw.com

SÁNCHEZ BETANCES, SIFRE & MUÑOZ NOYA
33 Bolivia Street, 5th Floor
San Juan, PR 00917
PO Box 364428
San Juan, PR 00936-4428
t (787) 756-7880
f (787) 753-6580